**Leon MOORE, Petitioner,**

v.

**Marti HAYES, Secretary of the Oklahoma County Election Board, and the Honorable Joe Cannon, Presiding Judge, Oklahoma County District Court, Respondents.**

No. 68519.

Supreme Court of Oklahoma.

Sept. 22, 1987.

Dissenting Opinion Sept. 29, 1987.

Rehearing Denied Nov. 10, 1987.

Robinson & Bower, Inc. by Jerry V. Beavin, Oklahoma City, for petitioner.

Robert L. Mitchell, Asst. Dist. Atty., and James F. Howell and Don Maranville, Oklahoma City, for respondents.

## AMENDED OPINION

KAUGER, Justice.

This original proceeding arose from the trial court's refusal to invalidate a municipal election, and because elections are matters of great public interest, we have assumed original jurisdiction. We find that the petitioner failed to demonstrate that illegal votes had been cast which would deprive the election results of mathematical certainty; but the Election Board's disallowance of one ballot as having been improperly marked was incorrect. As a result, we find the election to be a tie, from which the winner must be determined by lot.[1] A writ of prohibition is therefore granted, prohibiting the issuance of a certificate of election.

The petitioner, Leon Moore, appeared to be the loser to the real party in interest, Verna Kolar, in the election for the Ward 3 City Council seat in Nicoma Park, Oklahoma, by a count of sixty-five votes to sixty-four votes. On the petitioner's motion, a recount was conducted before the respondent District Judge, the result of which was to leave the final tally unchanged. The petitioner also filed a petition alleging irregularities pursuant to 26 O.S.Supp.1983 § 8–120,[2] which was heard contemporaneously with the recount.

---

1. Title 26 O.S.1981 § 8–105 provides:

 "When a tie vote occurs in the nomination or election of any candidate in any Primary or General Election, the election board which is authorized by law to issue the certified list or certificate of election shall, at a public meeting of the board and in the presence of the candidates involved, if they or any of them desire to be present, select the nominee or electee by lot and in such manner as the Board may select. When a tie vote occurs for the nomination of a candidate at a Primary Election, both names shall be placed on the Runoff Primary ballot."

2. Title 26 O.S.Supp. 1983 § 8–120 provides:

 "When a petition alleging irregularities other than fraud is filed, said petition must allege a sufficient number of irregularities and of such nature as to:
 1. Prove that the contestant is lawfully entitled to be certified the party's nominee or to be issued a certificate of election, or to have his name appear on the Runoff Primary Election ballot; or
 2. Prove that it is impossible to determine with mathematical certainty which candidate is entitled to be certified as the party's nominee or to be issued a certificate of election, or

At the hearing before the trial court, on March 25, 1987, the petitioner produced five witnesses who had been allowed to vote in the Ward 3 election; each of them claimed to be registered to vote in Ward 3. Four of these witnesses testified that although they once lived in Ward 3, each had moved outside of the geographical limits of the ward for a period of at least two months preceding the election. One witness testified that she maintained a business in Ward 3 and had registered there upon instructions from the county election board, lacking any other more permanent address. The petitioner argued that these five votes were illegally cast, robbing the election results of the mathematical certainty required by *Hembree v. City of Stilwell*, 597 P.2d 1218, 1220–21 (Okla.1979). In *Hembree*, we held that if the number of illegal votes shown to have been cast exceeds the margin held by the leading candidate, the winner cannot be determined with mathematical certainty, within the meaning of 26 O.S.1981 §§ 8–120(2), 8–122.[3]

The petitioner also urged that the respondent Election Board had erroneously refused to count two ballots as having been improperly marked. The petitioner claims that if one or both of these ballots had been counted in his favor, he would either have been victorious, or at the very least the contest would have ended in a tie. The trial court found that the votes of the five witnesses were not illegally cast, and that the Election Board had been correct in disallowing the two improperly marked ballots. The petitioner then commenced this original proceeding, essentially urging the same arguments that were presented to the trial court.

## I

## MATHEMATICAL CERTAINTY OF ELECTION RESULTS

■ The petitioner's first contention is that five of the votes in the Ward 3 election were illegally cast, by persons who were not residents of Ward 3. The Nicoma Park City Charter does not, on its face, prohibit a voter from participating in an election in any ward other than the ward of his actual residence. However, the City Charter § 7–5 does provide that:

> Every qualified elector of the city shall be entitled to vote for one candidate for mayor, and every qualified elector of a ward shall be entitled to vote for one candidate for councilman from his ward.

The plain language of this Charter section thus seems to admit no other reasonable construction than to restrict ward voting to the qualified electors who are residents of that ward. This view recognizes the distinction implicit in the Charter between qualified electors of the city—residents of the city—all of whom are entitled to vote in the mayoral contest, and qualified electors of a ward—residents of the ward—who alone may vote for council member from that ward, to the exclusion of all other qualified electors of the city. To hold otherwise would result in a situation where any qualified elector of the city could vote in any ward without regard to residence.

■ That construction would defy logic, and render superfluous the language of the Charter, which creates for each ward of the City of Nicoma Park a sub-class of qualified electors who alone are entitled to

to have his name appear on the Runoff Primary election ballot.

Additional irregularities may be presented at the hearing if not known to the contestant at the time the petition is filed. If such allegations are not made, the petition shall be deemed frivolous by the presiding judge and shall be dismissed. Said petition must be accompanied by either a cashier's check or certified check in the amount of Two Hundred Fifty Dollars ($250.00) for each county affected by the petition. Said petition must set forth specific allegations of irregularities in certain precincts or in the casting of absen-

tee ballots. If said petition is filed in the manner herein provided, the district judge of the county or such other judge as may be assigned by the Supreme Court shall hear and determine said issue in the same manner as provided for a petition alleging fraud. Deposits shall be used to defray actual costs as provided for recounts."

3. Title 26 O.S.1981 § 8–122 provides the procedure to be followed upon a determination of the impossibility of certainty.

vote on ward matters. Legislative enactments must be interpreted so as to render every word and sentence operative, rather than in a manner which would render a specific provision nugatory.[4] Plainly, then, the qualified electors of the City of Nicoma Park who were entitled to vote for the council member from Ward 3 were the qualified electors who were residents of Ward 3 at the time of the election. The undisputed facts of this case relative to the issue of mathematical uncertainty are that five individuals cast votes in the Ward 3 City Council election at a time when none of them lived in that Ward.[5] However, this does not necessarily render their votes illegal. The question of residence for voting purposes has been held to be synonymous with domicile, and involves a factual inquiry into the place where one is habitually present, and to which, when he departs, he intends to return.[6] The dominant element in determining "legal residence" or "domicile" is the intention to abandon the former domicile and to acquire another, (animus manendi) without the intention of returning (animus revertendi).[7] When the existence of a legal residence or a domicile at a certain place has been shown, it will be presumed to continue until a contrary intention is shown.[8]

A person's intention as to residence is a question of fact to be determined by the trier of facts, and is conclusive on appeal unless shown to be clearly against the weight of the evidence.[9] One's place of present abode is only one of the factors which may be considered, but it cannot be regarded as conclusive.[10] A temporary absence, even if it extends for a period of years will not effect a change of residence.[11] Nor is the maintainance of a separate home inconsistent with the continuance of a person's legal residence in but one locality.[12] Other factors which have been recognized as persuasive in determining intent are the holding of local office,[13] the exercise of the right to vote in local elections,[14] business and domestic relations, community activities, personal habits, and other objective facts ordinarily manifesting the existence of intent.[15]

At the district court protest hearing petitioner produced five witnesses who voted in the Ward 3 election but were not actual residents thereof. Petitioner conceded the testimony of three of them was not sufficient to show an intent to abandon Ward 3 as their domicile, but urged that the votes of the other two render the outcome of the election uncertain.

Voter Loudermilk had moved from the ward some nine years earlier, and had previously attempted to change his registration. The change was not accomplished due to some misunderstanding on the part of election officials. On election day he executed at the polling place a form furnished by the Election Board entitled "Transfer On Election Day." This procedure is authorized by 26 O.S.1981 § 4–117, and allows a voter who has changed his residence to another precinct within the county to transfer on election day, voting that day in the old precinct with instructions that in future elections he must vote in the new one. Loudermilk's vote was

4. *State ex rel., Thompson v. Ekberg*, 613 P.2d 466–67 (Okla.1980).

5. The parties agreed at oral argument that the facts were not in dispute.

6. *Jones v. Burkett*, 346 P.2d 338, 341 (Okla.1959).

7. *Suglove v. Oklahoma Tax Commission*, 605 P.2d 1315, 1317–18 (Okla.1979); *Johnson v. Petty*, 138 Okla. 208, 281 P. 276, 279 (1929).

8. *Anthis v. Drew*, 123 Okla. 18, 252 P. 11, 14 (1925).

9. *Burke v. Burke*, 119 Okla. 254, 249 P. 1110–11 (1926).

10. *Jones v. Reser*, 61 Okla. 46, 160 P. 58–59 (1916).

11. *Anthis v. Drew*, see note 8, supra.

12. *In re De Coppet's Estate*, 141 Misc. 406, 252 N.Y.S. 654, 656 (1931).

13. *Larson v. Bunch*, 208 Okla. 278, 255 P.2d 486 (1953).

14. *Richmond v. Richmond*, 225 S.W. 126–27 (Mo.App.1920).

15. *Suglove v. Okla. Tax Com'n.*, see note 7, supra.

expressly permitted by statute to be cast in the precinct voted, and thus was properly counted in the Ward 3 election.

██ Voter Davis had given her tire shop address when registering at the request of election officials (she was in the process of moving at the time), and had never actually resided in that precinct. There was no evidence that she had abandoned her choice of domicile as the tire shop, however, and her vote was properly cast where registered.

The respondents have pointed out that a similar situation was presented to this Court in the case of *Clark v. State Election Board,* 653 P.2d 529 (Okla.1982). In that case, the votes cast by forty-one properly registered voters were ruled illegal because these voters had moved from one precinct to another prior to the election, and had failed to correctly transfer registration to their new precincts. Within a matter of months, however, in *Helm v. Slater,* 664 P.2d 377 (Okla.1983) the Court expressly overruled that decision, holding very simply that the construction of the applicable statutes in *Clark* "... constitutes an impermissible burden upon the right of suffrage within the meaning of Article 3, Section 1, Oklahoma Constitution." [16]

However, the dissenting opinion in *Clark* reveals a significant distinction between the decision in that case and the case at

bar. In *Clark,* the affected contest was for the nominee of the Republican Party to the office of State Representative from House District No. 71 in Tulsa County. The voters who were ruled ineligible for failure to correctly transfer their registration had moved from one precinct within House District No. 71 in Tulsa County, to another precinct within House District No. 71 in Tulsa County. The statutory construction which was found to be an impermissible burden upon the right of suffrage in *Helm, supra,* was the *Clark* opinion's notion that a vote cast by an otherwise qualified elector who had not properly transferred his/her registration, upon moving from one precinct to another, was *ipso facto* illegal. The dissent there was not concerned with the possibility that a resident of some other house district might be casting a vote in the House District No. 71 contest, which would be a situation analogus to the case at bar.

## II

### IMPROPERLY MARKED BALLOTS

The petitioner's remaining contention concerns the decision of the Secretary of the Election Board to disallow two allegedly improperly marked ballots, facsimilies of which are reproduced immediately below:

16. The full text of Okla. Const. art. 3, § 1, provides:

> "Subject to such exceptions as the Legislature may prescribe, all citizens of the United States, over the age of eighteen (18) years, who are bona fide residents of this state, are qualified electors of this state."

During oral argument, the petitioner acknowledged that these authorities were applicable to his position.

## OFFICIAL MUNICIPAL BALLOT
## PRIMARY ELECTION, MARCH 17, 1987
## CITY OF NICOMA PARK
## OKLAHOMA COUNTY

**FOR MAYOR,** 2 year term (Vote for One)

LELAND FOX

JOANNE K. BUCKMASTER

**FOR COUNCILMEMBER**
**WARD NO. 3,** 2 year term (Vote for One)

LEON MOORE

VERNA P. KOLAR

## PROPOSITION

Shall the City of Nicoma Park, Oklahoma, install and operate an emergency 911 telephone service and levy and collect a service fee or tax not to exceed five per cent (5%) for the first year and not to exceed three per cent (3%) for any year thereafter, of the amount received from the tariff for exchange telephone service or its equivalent, such fee or tax to be imposed for a period of three years, after which the governing body of such City may renew the levy of such fee or tax for not longer than three years at a time?

| For the above proposition | YES |
| Against the above proposition | NO |

**OFFICIAL MUNICIPAL BALLOT**
**PRIMARY ELECTION, MARCH 17, 1987**
**CITY OF NICOMA PARK**
**OKLAHOMA COUNTY**

**FOR MAYOR,** 2 year term (Vote for One)

| | **LELAND FOX** |
|---|---|
| | **JOANNE K. BUCKMASTER** |

**FOR COUNCILMEMBER**
**WARD NO. 3,** 2 year term (Vote for One)

| | **LEON MOORE** |
|---|---|
| | **VERNA P. KOLAR** |

**PROPOSITION**

Shall the City of Nicoma Park, Oklahoma, install and operate an emergency 911 telephone service and levy and collect a service fee or tax not to exceed five per cent (5%) for the first year and not to exceed three per cent (3%) for any year thereafter, of the amount received from the tariff for exchange telephone service or its equivalent, such fee or tax to be imposed for a period of three years, after which the governing body of such City may renew the levy of such fee or tax for not longer than three years at a time?

| For the above proposition | YES |
|---|---|
| Against the above proposition | NO |

---

**A.**

Ballot # 1 was discounted because both the electronic counting device, and the Secretary of the Election Board believed that it was "over-voted", reflecting an intention to vote for both candidates. Although the voter appears to have intended to vote for the petitioner by placing a black mark in the square beside his name, a

small dot appears in the square beside Kolar's name.

The Election Board's decision to disallow Ballot #1 was based on its belief that under 26 O.S.1981 § 8–114,[17] the recount had to be conducted "in the same manner" as the challenged election. The Secretary of the Election Board announced at oral argument that she was thus required to conduct the recount as if done by electronic counting equipment, even though the trial court had ordered a hand recount, because the original election had been electronically counted. Ballots which would be allowed by the electronic counting device would be counted, even if offensive to the standards of a hand recount;[18] and otherwise acceptable ballots would be disallowed if they were such as would be rejected by the electronic counting device. By this process, the Secretary explained, Ballot #1 was disallowed because of the hand-counter's knowledge that it would have been rejected by an electronic counting device. That machine would have counted the large black mark filling the square by petitioner's name as a vote for petitioner, and the small dot in the square by Kolar's name as a vote for Kolar, and then would have rejected the ballot as over-voted.

The decision to disallow Ballot #1 was left undisturbed.[19] It is nevertheless contrary to the plain language of 26 O.S.Supp. 1983 § 7–127(2),[20] purely as a matter of law, and is thus subject to our power of review over questions of law arising from a statutory election contest[21]—we do not consider ourselves hobbled by the dictates of a machine. We find that the recount in this case was misdirected in its focus. It aim appears to have been an assessment of the accuracy of the electronic counting devices, and while we do not discount the importance of that inquiry, we find it to be secondary. The primary concern of an election recount, whether conducted by hand or by machine is to find the will of the voters, as truly and faithfully as possible.

The dot in the box beside Kolar's name is plainly not an "X," cross, pair of intersecting lines, or a check mark, nor is it a circle or square which has been blackened in ink, even if the entire circle or square is not filled and even if the blackened portion may extend beyond the boundaries of the circle or square. The intention of this voter is discernable from the large, black mark filling the square beside the petition-

**17.** Title 26 O.S.1981 § 8–114 provides in pertinent part that:
"In conducting the recount of ballots, the county election board shall open each ballot box individually and shall assign said ballots to a group of counters appointed by the secretary of the county election board. Said counters shall then conduct the recount in the same manner as provided by law for counting ballots in Primary, Runoff Primary and General Elections...."

**18.** Title 26 O.S.Supp.1984 § 7–129.1 provides:
"In the event ballots are counted electronically by a voting device, writing or other marks on the ballot shall not invalidate a ballot or any portion of the ballot, provided the ballot is properly marked otherwise so that it may be counted by the voting device according to law."

**19.** Title 26 O.S.1981 § 8–112 provides that in the conduct of recounts it shall be the "sole duty" of the District Judge to "hear evidence as to whether the ballots have been preserved [as] prescribed by law, and as to whether they are the identical ballots cast by the voters, and that they have not been exposed to the reach of unauthorized persons...." Thereafter, the recount

shall be conducted "under the exclusive supervision of the county election board." The review of the challenged ballots by the trial judge was thus beyond his statutory authority. Neither party objected to the procedure employed, either before the trial court or on appeal. In her brief the respondent Secretary of the Election Board concedes that this Court must examine the ballots in question to determine the propriety of their exclusion in the recount.

**20.** Title 26 O.S.Supp.1983 § 7–127(2) provides:
"An 'X', cross, or two lines that meet, including the so-called 'check mark', the intersection or point of meeting of which shall be within or on the line of the proper circle or square, shall be valid. Such markings shall be hereinafter referred to as 'valid markings'. Such valid markings located otherwise on the ballot shall not be counted. Such valid markings shall include a circle or square which has been blackened in ink, even if the entire circle or square is not filled and even if the blackened portion may extend beyond the boundaries of the circle or square;"

**21.** *Boevers v. Election Bd. of Canadian County,* 640 P.2d 1333, 1335 (Okla.1981).

er's name, and extending beyond the boundaries of the square on all sides.

### B.

 Ballot # 2 was disallowed as "improperly marked" because of the voter's failure to make any kind of a mark within the proper square.[22] Ballot # 2 is unquestionably improperly marked under the provisions of 26 O.S.Supp.1983 § 7–127(2).[23] The voter ignored the squares which appear to the right of each candidate's name. Instead the voter marked an "X" on the line to the left of the candidate's name, and then apparently scribbled through the "X." These markings could be regarded as distinguishing, such as might invalidate the entire ballot under 26 O.S.Supp.1983 § 7–127(5).[24] Finally, even if this ballot were not found to be improperly marked for failure to include a mark within or on the proper circle or square, we can only conclude that the intention of this voter is obscure.[25]

 Because disallowance of Ballot # 1 was improper as a matter of law, it should be counted as a vote in favor of the petitioner Leon Moore—the result is a tie vote. Original jurisdiction is assumed, and the writ issued, prohibiting the issuance of a certificate of election, and directing that the councilmember for Ward 3 of the City of Nicoma Park be selected by lot, in a manner consistent with 26 O.S.1981 § 8–105.[26] Either party may file a petition for rehearing in this cause within ten (10) days hereof. No certificate of election shall be provided[27] until the mandate in this case is issued.

HARGRAVE, V.C.J., and KAUGER and SUMMERS, JJ., concur.

HODGES, LAVENDER and SIMMS, JJ. dissent from Part I, concur in Part II.

OPALA, J., dissents from Part II B, concurs in the remainder of the Court's opinion.

ALMA WILSON, J., concurs in Part I, dissents in Part II.

DOOLIN, C.J., disqualfied.

LAVENDER, Justice, dissenting in part, concurring in part:

The basis of the alleged irregularities urged by Moore was the voting for the Ward 3 post by voters who were not residents of the ward. The trial court rejected this argument on the basis that voters registered to vote in the Ward 3 race could continue to vote in that election despite the question of residence until they changed their voter registration. The trial court expressed concern that a contrary result would improperly abridge those voters' rights of suffrage.

Moore, however, points out that the Nicoma Park City Charter § 7–5 provides:

Every qualified elector of the city shall be entitled to vote for one candidate for mayor, and every qualified elector of a ward shall be entitled to vote for one candidate for councilman from his ward.

The plain language of this section appears to clearly restrict ward voting to the qualified electors who are residents of that ward. This view recognizes the distinction implicit between qualified electors of the city, all of whom would be entitled to vote in the mayoral contest, and qualified electors of the ward, those entitled to vote

---

**22.** We take judicial notice of the instructions provided to voters at the polling places, cautioning them to "fill in the box for the ... candidate ... of your choice," and providing unmistakable visual examples of valid ballot markings.

**23.** See note 20, supra.

**24.** Title 26 O.S.Supp.1986 § 7–127(5) provides: "Failure to properly mark a ballot as to one or more candidates or questions shall not of itself invalidate the entire ballot if the same has

been properly marked as to other candidates or questions, unless such improper marking shall constitute a distinguishing mark."

**25.** Title 26 O.S.Supp.1983 § 7–127(7) provides: "Any ballot or part of a ballot on which it is impossible to determine the voter's choice of candidate shall be void as to the candidate or candidates thereby affected."

**26.** See note 1, supra.

**27.** See Title 26 O.S.1981 § 13–106.

for a council member from that ward. A contrary construction would defy logic and render superfluous the language of the charter creating a sub-class of qualified electors entitled to vote on ward matters. Such a construction would result in a situation where any qualified elector of the city could vote in any ward election regardless of residence.

The trial court's concern over the suffrage rights of the nonresidents of Ward 3 was also misplaced. Title 26 O.S.1981 § 4–117, clearly would allow those voters to continue to cast their votes despite the change of residence. However, this section should not be read as allowing the nonresidents to cast votes for positions for which they no longer qualify as electors.

The question raised by Moore involves a factual determination to have been made by the trier of fact. The question of residence for voting purposes has been held to be synonymous with domicile, and involves a factual inquiry into the place where one is habitually present, and to which, when he departs, he intends to return.[1] A person's intention as to legal residence is a question of fact to be determined by the trier of fact and is conclusive on appeal unless shown to be clearly against the weight of the evidence. The transcripts of the hearing before the trial court, however, reveal that a ruling was not made on the basis of the question of the legal residence of the questioned voters. Two of those voters specifically testified that they did not maintain a residence in Ward 3. One of those testified she had never maintained a residence in the ward, but had registered on the basis of her business address on instructions of local election board officials. The other voter testified that he moved from Ward 3 nine years previous to the date of the challenged election. He had attempted to change his voter registration twice prior to the challenged election but was not furnished with materials to do so after request to the election board officials.

He did change his registration pursuant to 26 O.S.1981 § 4–117 on the date of the election but was still allowed to vote in the Ward 3 election. The testimony presented to the trial court by these two voters suggest only that they had no intent to maintain residences in Ward 3.[2] Any determination to the contrary would have been against the clear weight of the evidence. I therefore find that Moore has established the existence of irregularities in the voting of two ballots.

I agree with the majority opinion in which it is determined that one of the ballots refused by the election board should have been counted for Moore, and the result of the Ward 3 election would have been a tie vote. The presence of irregularities as to two of the votes cast in this election however, renders the task of determining which of the two candidates was entitled to be issued a certificate of election impossible of determination with mathematical certainty.[3] I would therefore issue the requested writ of prohibition to the Secretary of the Oklahoma County Election Board to prohibit the issuance of a certificate of election in the Ward 3 race. This matter should be remanded to the Oklahoma County Election Board for further proceedings in compliance with 26 O.S.1981 § 8–122.

HODGES and SIMMS, JJ., join in the views expressed in this dissenting in part, concurring in part opinion.

OPALA, Justice, with whom ALMA WILSON, Justice, joins, dissenting from Part II(B) and concurring in the remainder of the court's opinion.

I

I concur in Part II(A) of the opinion because the machine-readable ballot used in the election clearly manifests the elector's intent to cast a vote for Leon Moore, the petitioner in this proceeding. *In the face of a plainly manifested voter's intent*, the

---

1. *Jones v. Burkett,* 346 P.2d 338 (Okla.1959).

2. See *Suglove v. Oklahoma Tax Commission,* 605 P.2d 1315 (Okla.1979) for a discussion of factors relevant to a determination of domicile.

3. See 26 O.S.Supp.1983 § 8–120(2).

court today correctly rejects the notion pressed by the State Election Board's instructions to the county election officials that "human counters" should always apply the very same counting criteria as those which the voting devices are programmed to follow.[1]

## II

I dissent from today's invalidation of the ballot discussed in Part II(B) of the court's opinion because the mark drawn by the voter to the left of the candidate's name clearly and distinctly expresses his choice of the candidate. The small square to the right of the candidate's name is not sufficiently distinctive to invalidate the ballot under the command of 26 O.S.Supp. 1983 § 7–127(2).[2] There is here *no* proof of the voter's intent to set his ballot apart from others by a "distinguishing mark." [3] *Boevers v. Election Bd. of Canadian County,* Okl., 640 P.2d 1333, 1336 [1981] and *McClelland v. Erwin,* 16 Okl. 612, 86 P. 283, 287 [1906]. Moreover, I would deem the questioned ballot valid since it was

clearly possible for the human counters to determine the voter's choice of candidate.[4]

The terms of § 7–127(2)[5] cannot easily be made applicable to a machine-readable ballot. Unlike on a paper ballot, the square to be marked on a machine-readable ballot is utterly indistinctive to an untrained person. It should make no difference for purposes of counting a machine-readable ballot whether the mark is in the square to the right of the candidate's printed name or to the left *so long as it is possible* to determine, within the meaning of § 7–127(7), the voter's choice of candidate.[6]

I hence recede from the notion that the ballot in contest is invalid either because it is tainted by the mark affixed by the voter in the wrong place or by the incapability of the voting device to count it.

1. The State Election Board's instructions to the county election boards was based upon the terms of 26 O.S.1981 § 8–114 which provided that human counters shall carry out a recount in the same manner as that prescribed by law for counting paper ballots in primary, runoff primary and general elections. The State Election Board's interpretation of § 8–114 was that ballots in counties using voting devices must be *recounted* in the very same manner as that which the voting machines are programmed to follow. In short, where the machine-readable ballots must be recounted by human beings, the State Election Board directed that human counters apply the same counting criteria as would the machines. Because a voting machine would pick up the dot on the ballot next to the name of Kolar, as well as the full mark next to the name of Moore, that machine-readable ballot could not be counted by the voting device for want of a voter's clear indication of his choice between the two candidates.

2. The terms of 26 O.S.Supp.1983 § 7–127(2) provide:

"An 'X', cross, or two lines that meet, including the so-called 'check mark', the intersection or point of meeting of which shall be within or on the line of the proper circle or square, shall be valid. Such marking shall be hereinafter referred to as 'valid markings'. Such valid markings located otherwise on the ballot shall *not* be counted. Such valid markings shall include a circle or square which has

been blackened in ink, even if the entire circle or square is not filled and even if the blackened portion may extend beyond the boundaries of the circle or square;"

3. The term "distinguishing mark" is one of art. It does not include every form of excess material that is penned on the ballot but is not needed to show the voter's designated intention. Under the proscribed rubric fall only those marks—not used in an attempt to indicate a voter's choice—which show on the face of the ballot, or from some evidence *aliunde*, a deliberate intent of having been placed there to set the ballot apart from others. A ballot bearing distinguishing marks is capable of being identified. The purpose of the rule making such ballots void is to protect the secrecy of elections and to discourage bribery, fraud or corruption. *Boevers v. Election Bd. of Canadian County, supra* 640 P.2d at 1336, and *Gentry v. Reinhardt,* 350 Ill. 582, 183 N.E. 631 [1932].

4. The terms of 26 O.S.Supp.1983 § 7–127(7) provide:

"Any ballot or part of a ballot on which it is impossible to determine the voter's choice of candidate shall be void as to the candidate or candidates thereby affected."

5. See footnote 2 *supra.*

6. See the terms of 26 O.S.Supp.1983 § 7–127(7), *supra* note 4.